**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| JEREMY HUNT, *et al.* | |
| Plaintiffs, | |
| v. | Case No. 8:18-cv-02485-PX |
| ALDI, INC. | |
| Defendant. | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF A COLLECTIVE AND FACILITATION OF NOTICE

Noah A. Finkel (*pro hac vice*)
*nfinkel@seyfarth.com*
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000

Louisa Johnson (*pro hac vice*)
*lojohnson@seyfarth.com*
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309-3958
Telephone: (404) 888-1023

Eric J. Janson (MD 16928)
*ejanson@seyfarth.com*
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 463-2400

Counsel for Defendant ALDI Inc.

### TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     THE COURT LACKS PERSONAL JURISDICTION OVER THE VAST
        MAJORITY OF STORE MANAGERS WHO HAVE NO CONNECTION TO
        THE FREDERICK DIVISION ..................................................................................3

III.    THE COURT CANNOT ADJUDICATE THE CLAIMS OF STORE
        MANAGERS WHO HAVE AGREED TO INDIVIDUAL ARBITRATION
        WITH ALDI.............................................................................................................6

IV.     THE COURT SHOULD NOT GRANT PLAINTIFFS' MOTION BECAUSE
        THEY ARE NOT SIMILARLY SITUATED TO OTHER STORE
        MANAGERS ..........................................................................................................11

        A.      The "Similarly Situated" Standard......................................................11

        B.      Substantial Discovery Has Occurred In This Case .............................12

        C.      Facts Developed During Phase One Discovery...................................13

                1.      ALDI Has a Decentralized And Varied Organizational Structure............13

                2.      If Plaintiffs' Claims Are True, They Did Not Perform Duties That
                        Were Similar To Other Store Managers. ...................................................15

                3.      As Plaintiffs Admitted In Their Depositions, They Have No Basis
                        For Concluding That Others Are Similarly Situated To Them................21

        D.      Plaintiffs Are Dissimilar From Other Store Managers In Their Duties. ...............22

        E.      Plaintiffs Are Also Dissimilar From Other Store Managers In Terms Of
                Their Exempt Classification And Salary-Based Pay. ..........................................25

V.      PLAINTIFFS ALREADY HAVE ISSUED NOTICE REPEATEDLY ..........................26

VI.     IF A COLLECTIVE WERE CERTIFIED, THE TEMPORAL SCOPE
        SHOULD BE NO MORE THAN THREE YEARS FROM A CERTIFICATION
        ORDER. ................................................................................................................31

VII.    THIS COURT SHOULD NOT ORDER PRODUCTION OF ALTERNATIVE
        CONTACT INFORMATION OR PERMIT MULTIPLE MEANS OF NOTICE ..........34

VIII.   CONCLUSION .....................................................................................................35

## I.    INTRODUCTION

Plaintiffs are former Store Managers of Defendant ALDI Inc. ("ALDI") who each were the highest-ranking employee in their respective stores. They were paid a salary and a monthly bonus based on how well each managed his or her store's performance, and they were classified as exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA").

Plaintiffs have sued under the FLSA on the theory that they did the same manual labor as their subordinates who were paid a fraction of what they earned as Store Managers and therefore that they should have been classified as non-exempt and paid overtime on top of their nearly six-figure annual compensation for work in excess of 40 hours per week. They have moved for conditional certification of an FLSA collective and the issuance of notice to all Store Managers nationwide, including those Store Managers who, unlike Plaintiffs, were hourly-paid, non-exempt employees. Relying on a combination of discovery and self-serving declarations they created after their depositions to try to change their deposition testimony, Plaintiffs suggest to this Court that this FLSA lawsuit is simple and straightforward and thus deserving of a rubber stamp on a broad, nationwide collective of hourly-paid and salaried Store Managers.

But this FLSA lawsuit is neither simple, at least with the broad scope that Plaintiffs imagine for it, or one in which collective certification would be appropriate for four reasons. First, Plaintiffs are asking this Court to ignore personal jurisdiction requirements that must be followed to protect the due process rights of ALDI. As explained in ALDI's pending Motion for Partial Summary Judgment on Personal Jurisdiction Grounds (Doc. 47), ALDI is not subject to general jurisdiction in Maryland, and its only source of minimum contacts with the state of Maryland is its Frederick, Maryland Division office through which only those Store Managers in and near Maryland were managed and paid. Yet the collective Plaintiffs seek to certify would

include thousands of individuals whose employment with ALDI has no nexus with the Frederick Division and whose claims would not subject ALDI to personal jurisdiction in this Court.

Second, the FLSA collective Plaintiffs seek to certify would include approximately 1,800 individuals who are bound by agreements to arbitrate with ALDI on an individual basis pay-related disputes and who thus have agreed not to participate in a collective action against ALDI. As explained in ALDI's fully-briefed motion to compel arbitration (Doc. 51 and 57), Plaintiffs have not challenged the validity of that arbitration agreement.

Third, this is not a case in which only limited discovery has occurred and therefore only a few facts have been developed about the relative job duties and pay of Plaintiffs and putative collective members. Rather, much discovery has occurred, and the evidence establishes significant variations in the primary duties of Plaintiffs versus other Store Managers and how they have been paid, both of which would impact a determination on the merits of Plaintiffs' claim of misclassification as salaried employees exempt from overtime pay. In other words, even a collective limited to Frederick Division Store Managers who are not bound by arbitration agreements with ALDI would be inappropriate because the myriad dissimilarities among Plaintiffs and other Store Managers would not allow for collective determination of the FLSA overtime claims of Plaintiffs and each opt-in plaintiff.

Fourth, Plaintiffs and their counsel already have repeatedly and through multiple means notified Store Managers about this lawsuit. Moreover, the messages they have sent have been one-sided and thus prejudicial to ALDI. Any further notice would only repeat and reinforce the biased messaging to ALDI's current and former Store Managers. For all of these reasons, Plaintiffs' Motion for conditional certification and the issuance of notice to a collective should be denied.

## II. THE COURT LACKS PERSONAL JURISDICTION OVER THE VAST MAJORITY OF STORE MANAGERS WHO HAVE NO CONNECTION TO THE FREDERICK DIVISION

The Court should not grant nationwide collective action certification because it does not have personal jurisdiction over the claims having no nexus with ALDI's Frederick, Maryland Division. Section 16(b) of the FLSA does not authorize a class action but instead "is properly viewed as a rule of joinder under which only the individual opt-in plaintiffs have legal status, not the aggregate class of aggrieved employees." *Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 3d 43, 59 (D. Mass. 2018) (citation omitted). For this reason, putative opt-in plaintiffs in an FLSA lawsuit are more analogous to the plaintiffs joined in the mass tort action in *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty.*, ___ U.S. ___, 137 S. Ct. 1773, 1781-82 (2017), than they are to Rule 23 putative class members. *Roy*, 353 F. Supp. 3d at 59-60; *see also* Def.'s Reply on Sum. J., Doc. 55, at 4-6 (citing additional cases). In this case, it is undisputed that ALDI is not subject to general jurisdiction in Maryland because ALDI is not headquartered in and does not have its principle place of business in Maryland. *See* Jeff Baehr Declaration ("Baehr Decl. I"), Doc. 47-2, ¶ 3. Thus, as in *Bristol-Myers Squibb* and under the well-established personal jurisdiction principles, Plaintiffs must show that ALDI is subject to specific jurisdiction as to all putative collective members' claims. *Roy*, 353 F. Supp. 3d at 60.

In other words, "[s]imilarity of claims, alone, is not sufficient to extend personal jurisdiction to out-of-state opt-in plaintiffs." *Id.* (citing *Bristol-Myers Squibb*, 137 S.Ct. at 1781; *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 875 (N.D. Ill. 2017) ("Neither decision supports the notion, squarely rejected by *Bristol-Myers [Squibb]*, that a court has personal jurisdiction over a plaintiff's claims that lack a sufficient nexus to the forum state just because those claims are closely related to another plaintiff's claims that do have that nexus.")). Rather, Plaintiffs would need to establish that each out-of-state putative opt-in plaintiff's FLSA claim

somehow creates sufficient minimum contacts for ALDI with the state of Maryland to ensure due process protections for ALDI. *Roy*, 353 F. Supp. 3d at 60-61.

But the fact that those plaintiffs and putative opt-in plaintiffs who have worked for ALDI in any division other than the Frederick Division are bringing FLSA claims that do not create personal jurisdiction over ALDI in this Court has already been established in ALDI's fully-briefed Motion for Partial Summary Judgment on Personal Jurisdiction Grounds as to the claims of Plaintiff Gorts and opt-in plaintiffs Tucker and Foley. Doc. 47. In addition to ALDI's foreign status in Maryland, the key facts set forth in that Motion are as follows: ALDI's stores are divided across 25 divisions, each of which has its own Division Vice President and a different group of managers overseeing the stores and warehouses within the division. Baehr Decl. I ¶ 4. Payroll and HR functions are almost exclusively run from the divisional offices, all paychecks are issued by the division, and all personnel files are maintained in the division. *Id.* ¶ 7.

Plaintiffs have not disputed the division-specific nature of their employment relationship with ALDI, nor have they more generally disputed the lack of a nexus between ALDI's contacts with Maryland and the claims of Store Managers who have worked in divisions other than the Frederick Division. *See generally* Pls.' Opp. to Sum. J., Doc. 52. In fact, in opposing ALDI's Motion, Plaintiffs have not contended that they could establish that ALDI has minimum contacts with Maryland with respect to Store Managers who have been employed by ALDI in any division other than Frederick. *Id.* And in moving for conditional certification of a nationwide collective, Plaintiffs again fail to present this Court with any facts that would support the exercise of personal jurisdiction over ALDI as to the claims of putative opt-in plaintiffs who did not work in the Frederick Division. Under such circumstances, certifying a nationwide collective would violate ALDI's due process rights and create practical problems.

Certifying a nationwide collective would violate ALDI's due process rights because due process requires that each FLSA opt-in plaintiff's claim relate to ALDI's in-forum conduct. *See Bristol-Meyers Squibb*, 137 S. Ct. at 1789. But the FLSA claims of opt-in plaintiffs and putative opt-in plaintiffs who did not work as Store Managers within the Frederick Division bear no relation to ALDI's conduct in Maryland. As explained in *Roy*, it would violate the defendant's due process rights to certify a nationwide collective when a large majority of those who are likely to receive court-sanctioned notice of suit fall beyond the Court's authority. 353 F. Supp. 3d at 61-63 ("Because Plaintiffs cannot demonstrate a nexus between FedEx Ground's activities in Massachusetts and the payment of drivers who picked up packages from terminals outside Massachusetts, Plaintiffs cannot satisfy the relatedness requirement necessary to establish personal jurisdiction."); *see also Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 850 (N.D. Ohio 2018) (finding it lacked jurisdiction over the FLSA claims of non-Ohio putative collective members because their claims "have less of a connection to the State of Ohio than the non-California plaintiffs' claims had to the State of California in *Bristol-Myers [Squibb]*").[1]

Certifying a nationwide collective would also create practical problems because if a Store Manager who has worked for ALDI only in Texas were to receive notice of this lawsuit and join it, this Court would not be able to pass judgment on her claims without violating ALDI's due process rights. *See Bristol-Myers Squibb*, 137 S. Ct. at 1781-82. At bottom, certifying the nationwide collective Plaintiffs seek here is little different than advertising a sale, having an out-of-state person place an order, and then rejecting that order because shipping out-of-state is not

---

[1] Less than a month ago, another district judge reached the same decision, *Chavira v. OS Restaurant Servs., LLC et al.*, 2019 WL 4769101, at *6 (D. Mass. Sept. 30, 2019), concluding that *Bristol-Myers Squibb* applies to FLSA collective actions and refused to certify a nationwide collective because it would not have personal jurisdiction over out-of-state opt-in plaintiffs. *Chavira*, 2019 WL 4769101, at *5-9.

possible. In the retail context, that might be false advertising. In the FLSA arena, it is ample reason not to certify a nationwide collective.

As in *Roy, Maclin*, and *Chavira*, this Court lacks jurisdiction over ALDI as to the claims of Store Managers whose employment has no connection to ALDI's Frederick, Maryland Division. To exercise authority over those claims would transgress ALDI's right to have claims against it heard in forums with a legitimate interest in the dispute. *See Roy*, 353 F. Supp. 3d at 62. Thus, this Court should deny Plaintiffs' Motion for nationwide collective certification.

## III. THE COURT CANNOT ADJUDICATE THE CLAIMS OF STORE MANAGERS WHO HAVE AGREED TO INDIVIDUAL ARBITRATION WITH ALDI

Collective certification should be denied because the majority of those who would receive notice have agreed to individual arbitration of any wage disputes with ALDI and to not participate in a collective action. The Fifth Circuit is the only appellate court to consider the question of whether employees who agreed to arbitration should receive notice of an FLSA lawsuit, and it has answered that question in the negative: "[D]istrict courts do not 'have unbridled discretion' to send notice to potential opt-in plaintiffs. … Instead, the purpose of giving discretion to facilitate notice is because of the need for 'efficient resolution in one proceeding of common issues.'" *In re JPMorgan Chase*, 916 F.3d 494, 502 (5th Cir. 2019) (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174 (1989)). Notifying employees who have agreed to arbitrate their claims about a pending FLSA lawsuit improperly "reaches into disputes beyond the 'one proceeding.'" *In re JPMorgan Chase*, 916 F.3d at 502 (quoting *Hoffman-La Roche*, 493 U.S. at 174). In sum, it would not be an appropriate use of discretion for a district court to authorize the issuance of notice of an FLSA lawsuit to individuals who cannot join it because they agreed to individual arbitrations. *In re JPMorgan Chase*, 916 F.3d at 504.

As set forth in ALDI's fully-briefed motion to compel arbitration of the claims of some

opt-in plaintiffs, on March 27, 2019, ALDI published an arbitration agreement to its then-current employees outside of California in its corporate office, divisional offices, warehouses, and stores (including, but not limited to, its Store Managers in the stores outside of California). Def.'s Mtn. Compel Arb., Doc. 51, at 3 (citing Declaration of Ryan Rasmussen ("Rasmussen Decl. I"), Doc. 51-2, ¶¶ 5-8). That arbitration agreement includes a collective and class action waiver and covers the FLSA claims brought in this case. *Id.* at 6-7 (citing Rasmussen Decl. ¶ 6 & Exs. 1-2).

Plaintiffs have not presented any evidence upon which the parties' fulfillment of the state contractual elements could be challenged, and they have not otherwise raised any arguments available under the law to challenge the validity of the agreements that opt-ins Welch and Krakowski entered with ALDI. Rather, Plaintiffs admitted in their response that they "are *not* asking this Court to invalidate the arbitration agreements." Pls. Opp'n at 4 (emphasis added).

Opt-ins Welch and Krakowski are not the only ones bound by the same valid arbitration agreement with ALDI. *See* Oct. 16, 2019 Declaration of Ryan Rasmussen ("Rasmussen Decl. II") ¶¶ 4-5, 7-8, attached as Exhibit A (confirming that the same arbitration agreement provided as part of ALDI's motion to compel arbitration binds all Store Managers outside of California who have been newly hired or have continued their employment since the rollout of the arbitration program). In total, ALDI estimates that about 1,800 non-California Store Managers are bound by arbitration agreements, including about 75 who have worked in the Frederick Division. *Id.* ¶¶ 5, 7-9. In other words, because any Store Managers who have become employed or remain employed after the rollout of the arbitration agreement are bound by it, if a collective including Store Managers who are bound by the arbitration agreement were certified, many who would receive notice of this lawsuit and may choose to opt in would need to be immediately dismissed because they agreed not to participate in a collective action against ALDI.

As explained in *In re JPMorgan Chase*, 916 F.3d at 502, when a valid arbitration agreement exists that covers FLSA claims and that contains a collective and class waiver, the persons bound by that agreement "cannot ultimately participate in the collective" and that ineligibility disqualifies them from receiving notice. *See also McGuire v. Intelident Sol'ns, LLC*, 385 F. Supp. 3d 1261, 1266 (M.D. Fla. 2019) (employees "who may be subject to a valid arbitration agreement should be excluded from this collective action at this notice stage"); *Graham v. Word Enters. Perry, LLC*, 2019 WL 2959169, at *3, *5 (E.D. Mich. June 18, 2019) (addressing defendant's motion to dismiss in favor of arbitration before conditional certification motion because it would not make sense to certify a collective for a claim that must be arbitrated, finding arbitration agreement valid as to many employees, and "conclud[ing] that the 100 employees who are bound to arbitrate may not receive notice of conditional certification if this Court grants it.") (quoting *Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 377 (5th Cir. 2016)).

To treat ineligible persons otherwise "merely stirs up litigation," which the court has a responsibility to avoid. *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) ("The courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation."). Therefore, a collective that includes Store Managers who have agreed to arbitrate their claims should not be certified and notice should not be issued to such Store Managers. To order otherwise would push this Court beyond the limits of its discretion. Neither the FLSA itself nor the Supreme Court in *Hoffman-LaRoche* provides that employees have a right to receive notice of a lawsuit in which they are unable to participate, and authorizing notice to those who cannot participate because of an arbitration agreement creates the appearance that the court has decided, without any basis for doing so, that ALDI's arbitration agreement with its Store Managers is invalid. *See In re JPMorgan Chase*, 916 F.3d at 501.

ALDI recognizes that there are some courts within the Fourth Circuit that have conditionally certified collectives including individuals who *may* have binding arbitration agreements. These cases are distinguishable, however, in that either (a) the defendants had not already moved to compel arbitration as ALDI has here, *see, e.g. Amrhein v. Regency Mgmt. Servs., LLC*, 2014 WL 1155356, at *10 (D. Md. Mar. 20, 2014) (explaining that it could not yet determine whether opt-in plaintiffs would be subject to valid arbitration agreements because the defendants had not filed a motion to compel arbitration); (b) the arbitration agreements' validity as to potential opt-in plaintiffs had not already been established because the already-joined plaintiffs had been found not to be bound by the arbitration agreement, *see, e.g., Weckesser v. Knight Enters. S.E., LLC*, 2018 WL 4087931, at *3 & n.3 (D.S.C. Aug. 27, 2018) ("The potential opt-in plaintiffs allegedly subject to arbitration agreements have not yet joined this action, and the Court therefore has no ability to determine whether any potential arbitration agreement[s] are enforceable against them."); or (c) it was unclear whether the arbitration agreement covered the claims before the court. *See Amrhein*, 2014 WL 1155356, at *10 (refusing to stay or limit collective certification pending briefing on arbitration because the value of claims at issue may be below the minimum value level by which the agreement defined claims subject to arbitration).

None of those situations is present here. The facts and circumstances surrounding the rollout of ALDI's arbitration agreement as well as the arbitration agreement documents are already before the Court, and Plaintiffs have not argued in opposition to ALDI's Motion to Compel either the validity of the agreement or the fact that it covers the claims at issue in this lawsuit. Furthermore, the substantial impact of certifying a collective including Store Managers with valid arbitration agreements is already clear. A nationwide collective would improperly invite approximately 1,800 Store Managers to join this lawsuit despite their inability to do so per

9

the terms of their arbitration agreement. And if a narrower Frederick Division collective were certified instead, nearly half—about 75 of the approximately 165 Frederick Division Store Managers—could not participate because of arbitration agreements.[2]

To avoid violations of the Federal Arbitration Act, unnecessarily stirring up litigation, and injecting into a lawsuit opt-in plaintiffs who could not lawfully participate in it, district courts both within and outside of the Fourth Circuit have refused to order the issuance of notice to putative collective members under circumstances like those in the instant case. *See Hudgins v. Total Quality Logistics, LLC*, 2017 WL 514191, at *4 (N.D. Ill. Feb. 8, 2017) ("It does not make sense to notify so many people about a lawsuit that they almost certainly are unable to join; this would constitute a waste of resources and would risk misleading those individuals into thinking they will be able to join the lawsuit."); *Feamster v. CompuCom Sys., Inc.*, 2016 WL 722190, at *4-5 (W.D. Va. Feb. 19, 2016) (finding *Amrhein, supra* and other similar cases distinguishable because the district courts in those cases "were not also faced with dispositive motions … pending simultaneously with the motion for conditional class certification"); *Fischer v. Kmart Corp.*, 2014 WL 3817368, *8 (D.N.J. Aug. 4, 2014) (simultaneously considering a motion to compel arbitration and a motion for conditional certification of an FLSA collective and, while granting conditional certification, limiting the scope of the collective to current and former assistant managers who are not bound by the arbitration agreement); *Daugherty v. Encana Oil & Gas (USA), Inc.*, 838 F. Supp. 2d 1127, 1130, 1133 (D. Colo. 2011) (compelling arbitration as to plaintiffs added as parties through an amended complaint and, while certifying a collective and

---

[2] *See* Baehr Supp. Decl., Doc. 55-1, ¶ 4 (approximately 165 salaried Store Managers have worked in the Frederick Division between June 2016 and June 2019); Rasmussen Decl. II ¶ 9 (approximately 75 Frederick Division Store Managers are bound by arbitration agreements).

authorizing notice, limiting the collective to those "who did not sign an Independent Contractor

Agreement containing an arbitration provision"). The same result should be reached here.

## IV.   THE COURT SHOULD NOT GRANT PLAINTIFFS' MOTION BECAUSE THEY ARE NOT SIMILARLY SITUATED TO OTHER STORE MANAGERS

Even a collective limited to Frederick Division Store Managers who are not bound by an

arbitration agreement would be inappropriate in this case for the reasons discussed below.

### A.   The "Similarly Situated" Standard

As to proceeding collectively, the FLSA states only that one or more employees may sue

"for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. §

216(b). District courts have created a two-step process of conditional certification and

decertification based on that two-word phrase, "similarly situated." But because certification is

not a congressional but rather a judge-made process, district courts must be careful to exercise

their discretion to authorize notice only "in appropriate cases." *Hoffmann-La Roche, Inc. v.

Sperling*, 493 U.S. 165, 169 (1989); *see also In re Family Dollar FLSA Litig.*, 2014 WL

1091356, at *2 (W.D.N.C. Mar. 18, 2014) ("If discovery prior to the notice stage uncovers

evidence that makes it clear that conditional certification of a class action is not appropriate, the

court may deny certification outright."); *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md.

2010); *Purdham v. Fairfax Cty. Pub. Sch.*, 629 F. Supp. 2d 544, 548 (E.D. Va. 2009) (courts

must first ask "whether this is an appropriate case in which to exercise . . . discretion" to approve

notice). Recognizing the need for a collective action to serve, rather than frustrate, the interests

of judicial economy, "[w]hen sufficient evidence in the record at the initial 'notice' stage makes

it clear that notice is not appropriate, ... a court can ... deny certification outright." *Syrja*, 756 F.

Supp. 2d at 686 (quoting *Purdham*, 629 F. Supp. 2d at 547).

Plaintiffs, not Defendant, bear the burden of proving similarity. *See D'Anna v. M/A– COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995); *Radfar v. Rockville Auto Grp. LLC*, 2018 WL 2972485, at *4 (D. Md. June 12, 2018). But where a first phase of discovery has already occurred, courts have considered the evidence proffered by both sides. *See Blaney v. Charlotte-Mecklenburg Hosp. Auth.,* 2011 WL 4351631, at *5 (W.D.N.C. Sept. 16, 2011) (considering the evidence of both sides where the parties had conducted some discovery before the certification motion because "the Court cannot ignore the fact that the parties requested, and engaged in, some discovery on the certification issue") (collecting cases).[3]

### B.    Substantial Discovery Has Occurred In This Case

Substantial discovery occurred before Plaintiffs filed their conditional certification motion. The Court approved the parties' agreement to bifurcate discovery with phase one focusing on Plaintiffs' collective allegations to determine whether a collective should be certified. That discovery lasted for nine months—from early January 2019 through September 10, 2019 (*see* Doc. 30 and 53)—and included the following:

- A Rule 30(b)(6) deposition of ALDI's Frederick Division Vice President Jeff Baehr;

- Depositions of all four named Plaintiffs and opt-in plaintiff Patrick Foley;

- ALDI's responses to 46 interrogatories, 10 requests for admission, and 51 document requests from Plaintiffs and opt-in plaintiffs;

- ALDI's production of more than 4700 pages of documents and spreadsheets;

- Plaintiffs' and opt-in plaintiffs' individual responses to a collective total of 18 interrogatories, 78 document requests, and 24 requests for admission; and

- Plaintiffs' and opt-in plaintiffs' production of approximately 360 pages of documents.

---

[3] *See also Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 481 (S.D.N.Y. 2016) (considering both parties' evidence when evaluating conditional certification); *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826 (N.D. Ohio 2011) (same); *Bowman v. Crossmark, Inc.*, 2010 WL 2837519, at *4 (E.D. Tenn. 2010) (same); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004) (same).

### C.      Facts Developed During Phase One Discovery

As a result of that discovery, all of the following facts have been established:

### 1.      ALDI Has a Decentralized And Varied Organizational Structure

ALDI has approximately 1,868 grocery stores that are spread across the U.S. Baehr Decl. I ¶ 4. The stores are divided across 25 different divisions, each of which has its own Division Vice President and a different group of managers overseeing the stores and warehouses within the division. *Id.*

Each division is subdivided into districts and assigned to a District Manager, with each district containing up to six stores. *Id.* ¶¶ 5-6. While the District Managers provide support and feedback to the Store Managers in their district, it is the Store Manager who manages his or her store. Baehr Decl. I ¶¶ 5-6; Declaration of Dylan Oakes, attached as Exhibit B, ("Oakes Decl.") ¶ 5; Declaration of Clayton Schrey, attached as Exhibit C, ("Schrey Decl.") ¶ 4.

The positions underneath the Store Manager vary by division and have changed over time. All stores have Store Associates whose duties are to stock, clean, and cashier. Hunt Dep., excerpts attached as Exhibit D, 39:3-24. That is where the similarities end. Some stores have Shift Managers who, at times, perform managerial duties and at other times perform Store Associate duties. Baehr Dep., excerpts attached as Exhibit E, 55:18-56:8, 109:15-110:8; Anderson Dep., excerpts attached as Exhibit F, 107:14-108:2 (explaining Shift Managers receive pay at a Store Associate rate when working as a Store Associate and earn additional hourly pay when working as a Shift Manager); Hunt Dep. 140:2-14 (same); Martin Dep., excerpts attached as Exhibit G, 68:17-70:12 (same). The Frederick Division's stores still have Shift Managers today. Baehr Dep. 132:21-133:6. But stores in a number of other divisions have eliminated the Shift Manager position and instead have had an Assistant Store Manager and a Lead Store Associate for the past year or more. Baehr Dep. 110:14-111:21, 128:8-129:6, 132:2-5. Some

stores also have one or two Manager Trainees who are in training to become Store Managers, but other stores do not. *Id.* 110:3-5; Gorts Dep., excerpts attached as Exhibit H, 133:14-19 (testifying he did not have a Manager Trainee).

Some stores, including some Frederick Division stores, also have a part-time Stocker whose sole purpose is to provide another pair of hands in stocking shelves, thus relieving the Store Associates to focus on other duties; in other stores, there are no Stockers because the Store Managers are the ones who determine whether having a Stocker would be helpful. Baehr Dep. 110:6-8, 129:7-131:2. In short, the type of staff and the skill set of that staff available to the Store Manager for delegating the various tasks that need to be completed in the store vary significantly not only by division but even by store and have changed over time.

The number of employees supervised by the Store Manager also varies. The average store has 15 to 20 employees; the largest stores have 35 to 45 employees. *Id.* 112:1-16. Contrary to Plaintiffs' efforts to suggest otherwise, this makes it extremely unlikely for the typical ALDI store to ever have only two employees at a time working. *Id.* 51:1-15 (describing the possibility of there being only two employees in a store as "very remote").

To the extent Plaintiffs' and opt-in plaintiffs' testimony is true, it is explained by the fact that their stores were atypical. Unlike most stores, Plaintiff Hunt's store had approximately 7 to 10 employees, Anderson had about 8 or 9 employees, Martin averaged 7 to 8 employees when he worked in Store 12 and 10 to 11 employees when he worked in Store 66, Gorts had about 7 or 8 employees, and opt-in Foley had around 11 employees. Anderson Dep. 219:19-220:15; Hunt Dep. 41:5-10; Oct. 14, 2019 Declaration of Jeff Baehr ("Baehr Decl. II") ¶ 4 (regarding Martin's stores' staffing), attached as Exhibit I; Gorts Dep. 126:16, 134:17-18; Foley Dep., excerpts attached as Exhibit J, 59:12-22 (not remembering his average number of employees but agreeing

that the store schedule showed 11 employees). As Jeff Baehr explained, "[t]here are not many stores that have less than 10 employees. There may be exceptions to that, but it's -- it's a very remote situation where we would have less than 10 employees in a store." Baehr Dep. 112:17-21; *see also* Declaration of Jason Bullins, attached as Exhibit K, ("Bullins Decl.") ¶ 5 (Store Manager Bullins supervises 24 employees); Declaration of Susanne Marie Dicus-Caulder, attached as Exhibit L, ("Dicus-Caulder Decl.") ¶ 5 (Store Manager Dicus-Caulder supervises 32 employees); Declaration of Sarah Lynam, attached as Exhibit M, ("Lynam Decl.") ¶ 5 (Store Manager Lynam supervises 15 employees); Declaration of Shqipe Recica Sefa ("Sefa Decl.") , attached as Exhibit N, ¶ 5 (Store Manager Sefa supervises 24 employees).

In addition to Plaintiffs' staffing levels being dissimilar from most Store Managers, Plaintiffs' conclusory allegation of a purported company policy of maintaining minimum staffing levels in the stores is simply unfounded. By way of example only, Plaintiff Martin confirmed the opposite at his deposition. Martin Dep. 52:19-24, 56:23-57:11 (admitting he was not shorthanded and made the decision to let others work the cash register rather than doing so himself). And as Baehr explained, there are "many inputs that factor into the staff size," which causes a store's staffing level to be individualized to the store. Baehr Dep. 112:1-11.

### 2. If Plaintiffs' Claims Are True, They Did Not Perform Duties That Were Similar To Other Store Managers

Plaintiffs are also outliers in claiming that they did not abide by the Store Manager job description. That job description sets forth as the first two "Objectives" of the position the following: "To manage all store operations and all operational personnel[,]" and "[t]o maximize sales and control expenses." *See* Dicus-Caulder Decl. ¶ 33 & Att. 1 (July 2014 job description); Sefa Decl. ¶ 35 & Att. 1 (Oct. 2016 job description).  The "Duties and Responsibilities" section then sets forth all of the following:

- delegating work and communicating performance expectations to staff;

- developing and implementing action plans to improve the store's operating results;

- interviewing and recommending candidates to be hired;

- recommending store employees for promotion and termination as appropriate;

- monitoring competitors and recommending adjustments as need be to maintain ALDI's competitive position in the local market;

- providing product feedback and recommending items to add or discontinue;

- training and developing store personnel;

- observing and providing feedback to store staff;

- conducting annual performance evaluations of store employees;

- ensuring that store employees interact appropriately with customers and co-workers and abide by the customer satisfaction guidelines;

- communicating ALDI's vision and values and creating teamwork among the staff;

- ensuring that the staff adheres to inventory procedures, product handling guidelines, cash control procedures, and the employee handbook and store procedures manual;

- resolving employees' complaints;

- creating, managing, and revising the work schedules of store employees;

- handling and resolving customer concerns;

- spotting and resolving any customer and employee safety issues;

- ensuring that the staff keep the store clean;

- ordering an appropriate amount of product to keep the store properly stocked;

- ensuring that store signs are maintained;

- ensuring that the products on the shelves are fresh and of good quality;

- achieving the store's payroll budget and total loss budget;

- merchandising product in order to maximize sales;

- planning and conducting store meetings; and

- conducting store inventory counts with the District Manager.

Dicus-Caulder Decl. Att. 1; Sefa Decl. Att. 1.

Unlike Plaintiffs, the non-party Frederick Division Store Manager declarants have confirmed in keeping with the "Objectives" of the position, that their "key function" as a Store Manager is to manage the store's operations and employees. Bullins Decl. ¶ 3; Dicus-Caulder

Decl. ¶ 4; Lynam Decl. ¶ 4; Sefa Decl. ¶ 4. They have also confirmed that they personally

perform the duties listed above and that they are not required to personally perform duties such

as cleaning, stocking shelves, or running a cash register. *See* Bullins Decl. ¶¶ 6-15, 17-18, 20-26;

Dicus-Caulder Decl. ¶¶ 6-13, 15-17, 19-27, 33; Lynam Decl. ¶¶ 5-10, 14, 16-22, 28; Sefa Decl.

¶¶ 5-13, 17-19, 21-30, 35.

Plaintiff Hunt has agreed with this assessment of what the job description requires and

does not require. Specifically, Hunt claimed at his deposition that he was required as a Store

Manager to "throw[] a truck" (*i.e.*, take product from the back room and move it to the store

floor). Hunt Dep. 36:12-23. But when asked to point to the place in the Store Manager job

description that showed he was allegedly required to stock shelves, he admitted that the job

description does not enumerate that as a duty of a Store Manager. *Id*. 37:25-38:5.  Instead,

"throwing a truck" or stocking shelves is a Store Associate job duty. *Id*. 39:3-24.

As Frederick Division Store Manager Susanne Marie Dicus-Caulder, who previously

supervised Plaintiffs Anderson and Hunt when they were Manager Trainees in the Frederick

Division, has pointed out, performing the duties set forth in the job description is a full-time job:

> Given the amount of time I spend on my key duties as a Store Manager, such as
> setting and adjusting work schedules and budgets; analyzing and making
> adjustments in reaction to daily reports; delegating tasks to the store employees;
> observing, training, coaching, and disciplining employees to make sure they
> perform the tasks delegated efficiently and properly; walking through the store to
> check on conditions; reviewing and approving employees' time entries; ordering
> product; planning and leading monthly store meetings and weekly manager
> meetings; and performing the other tasks I have described above, it would be
> extraordinarily difficult if not impossible for me to spend all day, or even most of
> the day, performing the same manual labor tasks (like throwing the truck,
> stocking, cashiering, or cleaning) that other store employees perform.

Dicus-Caulder Decl. ¶¶ 28, 31. Other Frederick Division Store Managers agree. *See* Bullins

Decl. ¶ 27 ("I understand that this lawsuit has been brought by Store Managers who claim to

spend all day, or most of the day, on the same tasks as their direct reports (such as stocking,

cleaning, and running cash registers). If this claim is true, their experiences are very different

from my own as a Store Manager at Aldi."); Lynam Decl. ¶ 23 ("Considering the time it takes to

set and adjust employee work schedules, prepare budgets, manage inventory levels, observe

employees' work performance, coach and train employees, discipline employees, conduct store

walk-throughs to check on the store's condition, delegate out additional tasks to employees to

address any issues spotted, handle customer complaints, complete various paper work, and

perform the other tasks I have described above, I do not have the time available to spend all day,

or even most of the day, performing my employees' tasks (such as stocking, cleaning, and

running cash registers) for them. I rely on them to do their jobs so that I can focus on mine.");

Sefa Decl. ¶ 31 (similar).

In total, these Store Manager declarants estimate that they spend 85 to 100% of their time

performing the managerial and supervisory tasks expected of Store Managers. Bullins Decl. ¶ 27

(100% of day); Dicus-Caulder Decl. ¶ 30 (85% of day); Lynam Decl. ¶ 25 (90% of day).

In stark contrast to their testimony, Plaintiffs and opt-in plaintiffs have claimed in their

post-deposition declarations either that they spent "almost all" or "80% to 90%" of their time

strictly on manual labor. Hunt Decl., Doc. 58-2, ¶ 13; Anderson Decl., Doc. 58-3, ¶ 13; Gorts

Decl., Doc. 58-4, ¶ 8; Martin Decl., Doc. 58-5, ¶ 7; Hoshield Decl., Doc. 58-6, ¶ 6; Krakowski

Decl., Doc. 58-7, ¶ 7. Yet, even in so testifying, Plaintiffs are not in agreement about what duties

comprised that time. For instance, Plaintiff Martin disagreed with the other Plaintiffs' claims of

spending a lot of time cashiering, explaining he spent "minimal" time on the cash register.

*Compare* Martin Dep. 57:2-11 *with* Hunt Dep. 254:16-20 (spent two to three hours of each day

on the cash register) *and* Anderson Dep. 211:5-21 (90% of time spent moving freight, stocking

shelves, cleaning, and running the cash register).

It is worth noting that Plaintiffs admitted during their depositions that they multi-tasked all the time by simultaneously performing managerial duties, such as supervising and training store staff, and manual labor.[4] Plaintiffs also admitted at deposition that their store employees were paid around $11 to $19 per hour, which is a mere fraction of what Plaintiffs earned—about $78,000 to $90,000 annually.[5] In addition to their claim of spending all or nearly all of their time doing the same job as their associates being incompatible with their multi-tasking admissions, Plaintiffs do not explain why they would be so much better paid than their store associates if they were truly spending nearly all day on manual labor. For now, however, this Court must assume that Plaintiffs' testimony of an extraordinary amount of time spent on manual labor is true. And that claim by Plaintiffs makes the duties they performed as Store Managers significantly dissimilar from other ALDI Store Managers in the most basic and essential of manners.

Indeed, Plaintiffs try to make their experience sound like the norm rather than the exception by citing the testimony of ALDI's witness, Jeff Baehr, for the proposition that Store

---

[4] Anderson Dep. 121:4-123:3 (when Anderson trained employees by working alongside them, she was not only doing manual labor but also simultaneously supervising, giving feedback to, and training that employee); Hunt Dep. 96:25-97:12 (simultaneously training employees, doing quality checks and stocking), 117:18-118:2 (agreeing managers are supposed to simultaneously do their own work and supervise others; Hunt did that a lot as a store manager); Martin Dep. 56:13-22 ("Q. Okay. So are you kind of like you're wearing the manager hat and keeping an eye on them even when you're doing the stocking yourself? A. Yes. Q. So, essentially, you're having to multitask all the time. You're doing the managerial job and you're helping them throw the truck? A. Yes.").

[5] Anderson Dep. 107:14-108:2 (Anderson's store associates earned $12 to $14 per hour; shift managers earned an additional $4 or $4.50 per hour only for hours spent working as a shift manager), 194:18-195:11 (in addition to salary, Anderson received a sales bonus of $750 to $1,850 per month that no one else in the store was eligible to receive); Gorts Dep. 132:20-133:10, 135:6-136:11 (Gorts received $2300 per bi-weekly pay period in salary plus $1300 to $1700 per month in bonuses that other store employees were not eligible to receive); Hunt Dep. 140:2-14 (Hunt's store associates and shift managers were paid $11 to $12 per hour; shift managers received $4 extra per hour when working as a shift manager), 175:13-176:18 (in addition to his salary, Hunt received a monthly bonus that varied based on his store's performance but was as high as $1,911 in a month); Martin Dep. 68:17-70:12 (his store associates were paid $12.50 to $15 per hour; his shift managers were paid the same for associate work and $4 per hour extra for shift manager work; Martin's bi-weekly salary was about $2600; Martin also received a bonus that varied in the range of $1,500 to $2,100 per month); Foley Dep. 34:9-15 (earned about $90,000 per year when his salary and monthly bonuses were both considered).

Managers are "required" to and regularly perform the same manual labor as their subordinates.

*See* Pls. Br. at 8 (citing Baehr Dep. 63-64). But Baehr's testimony actually refutes that assertion:

> Q   Okay.  Based on the position descriptions for the store manager, it's fair to say that ALDI store managers do engage in stocking or restocking shelves at times?
> A   They are responsible to oversee and ensure that the stocking occurs within the stores and the shelves are replenished within the stores, in most all cases, through the -- the hourly labor within the store doing those actions.
> Q   So is your testimony that the store managers generally don't do any stocking and restocking?
> A   Generally, that is accurate.
> Q   Okay.  But they are required to be able to do it?
> A   That is correct.  From a teaching and training perspective it is necessary that the manager can develop their staff and in order to do so, they show the behaviors that they're trying to teach, train and develop.
> Q   Okay.  So the answer to my question is that they do sometimes stock and restock shelves?
> A   In the scenario of the teaching[,] training, developing, that may happen, yes.

Baehr Dep. 53:11-54:13 (emphasis added).

> Q   So if a store manager says that he spent a lot of time stocking or restocking shelves, you wouldn't dispute the possibility that that's true?
> A   I can't speak to every manager we've had.  However, *that would be an exception to the rule and it would indicate that that manager has performance issues because they haven't taught, trained and developed their store employees to do those responsibilities.*

Baehr Dep. 55:8-17 (emphasis added).

> Q   Okay.  Now, with respect to the duties of the store managers, in addition to their administrative duties and their training duties, they're required to be able to run the cash registers at the front of the store; is that correct?
> A   They're required to know how to do that, yes.
> Q   Okay.  Do they in fact run the cash registers at times, at the front of the store?
> A   At times?
> Q   Yes.
> A   At times it may occur, either through the training and development of staff or an out-of-the-ordinary extreme circumstance:  Three people called off sick this morning and don't show up to work.
> So, but from a scheduling perspective, the managers are not scheduled to ring on registers and cashier.
> Q   Okay.  But they do it now and again?
> A   In those circumstances I mentioned.

Q   So if a store manager testified that he ran the register, you would not disagree
     with that possibility?
A   I would not disagree with the possibility, *but it was due to a preference on the
     part of that manager or one of those extreme situations* that I've mentioned.

Baehr Dep. 60:6-61:13 (emphases added); *id.* 61:14-62:16 (also disagreeing that cleaning,

running a loader, and running a baler are duties required of a Store Manager and repeating that a

Store Manager would only personally perform such duties to train others, in emergency

situations, or as a matter of personal preference).

        In short, Plaintiffs' testimony—that rather than focusing on the duties enumerated in the

Store Manager job description, they spent nearly all of their time on the manual labor duties of

their subordinates—is directly at odds with the Store Manager job description and ALDI's

expectations of Plaintiffs and other Store Managers. This highlights how dissimilar Plaintiffs are

from the vast majority of Store Managers who, naturally, abide by and follow the job description

and ALDI's expectations that they manage store operations and personnel.

### 3.      As Plaintiffs Admitted In Their Depositions, They Have No Basis For Concluding That Others Are Similarly Situated To Them

        Plaintiffs also try to avoid their outlier status and manufacture a basis for their Motion by

making unsubstantiated, conclusory allegations in their post-deposition declarations that the

duties and experiences of all other Store Managers at ALDI nationwide have been the same. But

each Plaintiff and opt-in plaintiff Foley admit to not knowing whether all (or even most) other

Store Managers have performed duties similar to those that Plaintiffs claim to have performed:

Q   Between August 2015 and the end of your employment, can you testify as to
     the duties actually performed by any store manager other than the two you
     worked alongside for one to two months in Store 54?
A   No.  I can't swear what they did, what they didn't do, you know, how they
     chose to approach things.

Martin Dep. 106:7-14; *see also* Martin Dep. 152:10-153:1 (admitting that he does not "have any

firsthand knowledge" of whether other store managers had a final say in hiring or firing or how

other store managers and district managers interacted on these matters); Anderson Dep. 119:6-120:8 (although claiming that she personally was not allowed by her District Manager to make changes to her store's budget, admitting that budgeting responsibilities are set forth in the Store Manager job description and that there are lots of Store Managers whom she does not know and who may be performing the budgeting duties required by the job description); Foley Dep. 79:4-13 (admitting that he cannot testify about the duties that any of the other Store Managers perform); Gorts Dep. 143:17-25 (cannot speak based on personal knowledge about the duties of Store Managers in any store except the three in which he has worked); Hunt Dep. 201:20-202:4 (admitting that he cannot testify about the duties of Store Managers in other divisions).

**D.     Plaintiffs Are Dissimilar From Other Store Managers In Their Duties**

The focus in an exempt misclassification lawsuit like this case must be on "actual job duties of those in that job category to determine whether they are similarly situated." *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 518 (4th Cir. 2011) (citation omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (reasoning that mere existence of common exempt designation is insufficient to show that employees are similarly situated).

As shown above, Plaintiffs admit that they failed to focus on the managerial duties set forth in their job description and expected of them as salaried Store Managers and claim, contrary to other salaried Store Managers in the Frederick Division, that they spent "almost all" or "80% to 90%" of their time on manual labor that is *not* required by Store Managers per the job description. While the factual discrepancies between Plaintiffs' testimony and that of ALDI's witnesses should not be resolved at this stage, the clear dissimilarities in the testimony by Plaintiffs and other Store Managers about their duties establishes the lack of similarity necessary to certify a collective and issue notice. *See, e.g., In re Family Dollar FLSA Litig.*, 2014 WL 1091356, at *2 ("Even under the less strict notice stage standard, courts deny conditional

certification" in exempt misclassification cases where employees "'have the same job title, if their job responsibilities and duties differ among each other.'"); *Andrade v. Aerotek, Inc.*, 2009 WL 2757099, at *3-*4 (D. Md. Aug. 26, 2009) (denying conditional certification of a collective of recruiters and accounting recruiting managers where the evidence showed a number of duties differences in terms of the type and number of candidates recruited, the authority to hire and fire and negotiate wages and benefits, and the amount of client contact); *West v. Border Foods, Inc.*, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) ("neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper.").

Other courts similarly have denied conditional certification of a collective. For instance, in *Guillen I*, the assistant manager job descriptions described managerial duties, but the plaintiff asserted that he actually spent the majority of his time on non-exempt tasks, such as running a cash register, unloading trucks, stocking, cleaning, displaying the tags on merchandise, and displaying clothes in departments. *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 472 (S.D.N.Y. 2010) ("*Guillen I*"). He also submitted the declarations of four other assistant managers who made similar claims. *Id.* at 472-73. The court found that

> it [was] not sufficient for [plaintiff] to show that he and the proposed class of [assistant store managers] operated under the same job description. Instead, [plaintiff] must show that he and the other [assistant store managers] were similarly situated with respect to the claim that they were required to perform non-managerial job duties *in contravention of the formal job description*.

*Id.* at 476 (emphasis added). In addition, standardized operational and employment policies, standardized training, and a uniform management structure constituted insufficient proof of similarity because the purported standardization did not "relate to the claim that Marshalls' [assistant store managers] are required to perform non-exempt tasks for a majority of their workweek in contravention of the [assistant store manager] job description." *Id.* at 477.

Similarly, in *In re Family Dollar FLSA Litig.*, plaintiffs' testimony was that they did not perform

most managerial duties set forth in the job description while the store manager declarations

submitted by the defendant showed that the non-party store managers had admitted to

performing many (or all) of the duties in the job description. 2014 WL 1091356, at *4. The court

found that it "cannot assume that every Family Dollar Store Manager spends a majority of their

time doing non-managerial tasks or that every Store Manager performs or does not perform

various managerial duties in the same manner as Plaintiffs did." *Id.* at *5. Accordingly, the court

granted the defendant's motion to strike the collective allegations. *Id; see also, e.g.*, *Khan v.*

*Airport Mgmt. Servs.*, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011) (denying collective

certification where the plaintiff was "asserting that he and other employees were not given duties

in conformity with" the job descriptions but failed to show that putative collective members were

similarly situated with respect to performing different duties than those set forth in the job

description); *Tahir v. Avis Budget Grp., Inc.*, 2011 WL 1327861, at *3 (D.N.J. Apr. 6, 2011)

(denying collective certification where "[t]he theory of liability ... is that contrary to the

information contained in the job description … [putative collective members] performed tasks

associated with non-exempt employment under the FLSA" because a liability determination

would require examining individual employees' job duties); *Mike v. Safeco Ins. Co. of Am.*, 274

F. Supp. 2d 216, 221 (D. Conn. 2003) (denying certification where, although putative collective

members "shared a common job description and were expected to perform the tasks enumerated

in that specific job description . . . [the plaintiff] expressly disavow[ed] this job description and

claim[ed] that, on a task-to-task, day-to-day basis, he spent the balance of his time performing

non-administrative functions," not the administrative functions required by his job description).

Plaintiffs' testimony about their job duties shows that they performed markedly different duties from those expected of ALDI and performed by other Store Managers in the Frederick Division. Even a comparison of the deposition testimony of the various Plaintiffs shows that they are not similar to one another in terms of duties with some claiming to have spent a lot of time cashiering and another describing his cashiering time as "minimal." *Compare* Hunt Dep. 254:16-20, *and* Anderson Dep. 211:5-21, *with* Martin Dep. 57:2-11 (preferring to make one of his store employees man a cash register first: "I wanted to finish writing my order and do what I needed [to] do, so I would call somebody else up."). Under such circumstances, certifying a collective would not serve the interests of judicial economy or be appropriate in this case.

### E.      Plaintiffs Are Also Dissimilar From Other Store Managers In Terms Of Their Exempt Classification And Salary-Based Pay

ALDI's Store Managers are also dissimilar in terms of pay and classification because some are not salaried. Pls.' Mtn. at 9 § C (admitting California Store Managers are not classified by ALDI as exempt, salaried employees). Plaintiffs ask this Court to ignore this dissimilarity and, in doing so, make two disturbing misstatements on this issue in their Motion: (1) asserting with no evidence in support that California Store Managers "were converted to hourly employees" "as the result of earlier state action," and (2) claiming that the only Store Managers who are not classified as salaried, exempt employees are in California. Pls.' Mtn. at 9 & n.9.

First, ALDI decided to classify California Store Managers as non-exempt, hourly-paid employees because it believes that the law in California is different:

Q   Okay.  All of the store managers in California are paid on an hourly basis?
A   That's my understanding, yes.
Q   Okay.  Was that the result of litigation?
A   I don't believe so.
Q   Was it the result of an investigation by the California Department of Labor?
A   Don't believe so.
Q   Okay.  Do you know why that is?

A   State law differences in California from the rest of the country spell out a
    different set of requirements for exempt and nonexempt employees.

Baehr Dep. 93:12-94:4; *see also id.* 106:19-107:7 (confirming that ALDI pays California store

managers on an hourly basis because it believes "state laws are different in California").

Plaintiffs provide no evidentiary cite to support their bold statement suggesting some

finding of wrongdoing by ALDI that caused it to "convert to hourly" California Store Managers

because none exists. The incontrovertible truth is that all Store Managers employed in California

stores have been classified as non-exempt, hourly-paid since the first ALDI stores opened in that

state in March of 2016. Declaration of Lynn Moser, attached as Exhibit O, ("Moser Decl.") ¶ 4.

Second, Plaintiffs' misstatement to the Court that the only Store Managers who are not

classified as salaried, exempt employees are in California is also something that Plaintiffs

learned from Jeff Baehr is not true. There are some Store Managers across ALDI's divisions

outside of California who have been classified as non-exempt as well. Baehr Dep. 118:7-19.

Employees who are paid differently cannot be certified in the same collective. *See, e.g.*

*Szalczyk v. CBC Nat'l Bank*, 2017 WL 86014, at *3 (D. Md. Jan. 10, 2017). In *Szalczyk*,

plaintiffs asked this Court to certify a collective of loan officers that included both exempt and

non-exempt employees. The Court refused, reasoning that status and pay differences rendered

the two groups dissimilar. *Id.* at *4; *see also Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 120

(D.D.C. 2004) (plaintiffs failed to "identify a single case where a court has included" exempt and

non-exempt employees in the same collective); *Kinnett v. Kansas*, 1991 WL 241832, at *1 (D.

Kan. Oct. 30, 1991) (exempt and non-exempt classified employees are "not similarly situated").

## V.   PLAINTIFFS ALREADY HAVE ISSUED NOTICE REPEATEDLY

Notice to a putative collective is inappropriate for an additional reason. To instigate this

lawsuit, Plaintiffs' counsel embarked on a campaign to solicit the named Plaintiffs and then

directly and through Plaintiffs notified other Store Managers about this lawsuit. The full extent

of their notification efforts remains unclear, but, at a minimum, their efforts have included

mailings in late 2017, April 2018, and October 2018, cold calls in 2017 and 2018 to individuals

about their interest in joining this lawsuit, and biased information about this lawsuit on Plaintiffs'

counsel's law firm website. At least one of the mailings—the one issued in October 2018—was

accompanied by a Consent To Join Form. *See* Oct. 2018 Letter, attached as Exhibit P.

When ALDI sought discovery as to Plaintiffs' lawsuit notification efforts, Plaintiffs

resisted, and ALDI sought Court involvement. At the discovery conference on this issue with the

Court on April 4, 2019, the Court noted the following about Plaintiffs' solicitation efforts:

> I got to tell you it is troubling to me because it does in sum and substance
> constitute an[] end run around the opt in process. When -- you are telling me that
> if they sign here, they are authorizing consent of the filing and prosecution of the
> FLSA action in their name and on behalf of all persons similarly situated. That is
> ultimately going to be my call.

*See* Trans. 7:8-14, attached as Exhibit Q; *id.* 10:21-25 ("the big elephant in the room is this is all

about conditional certification of a particular class and you have already sent out one solicitation

which basically does in the [sic] end run around the very process that we are engaging in.").

At the conclusion of that conference, the Court ordered Plaintiffs to respond to ALDI's

discovery requests seeking information about all solicitation efforts, which the Court made clear

should include not only letters by U.S. Mail but also "social media which would be your website

except I can't find any evidence that on the -- [plaintiffs' counsel interruption] --- and you all

have to get to the bottom of that. So in sum and substance, I am going to grant the -- I am going

to say that you have to comply with the ROG {sic} and the RTD."[6] Trans. 16:22-17:5.

---

[6] At issue during the April 4, 2019 discovery conference were (a) Document Request No. 2 to Plaintiff
Hunt which reads, "All documents concerning your communications with those whom you contend are
similarly situated to you. This specifically includes but is not limited to communications like the one
attached as Exhibit "A" that your attorneys sent on your behalf in this case"; and (b) Interrogatory No. 4

Despite this Court's instruction at that April 4, 2019 discovery conference, Plaintiffs' responses to discovery have been far from complete. For instance, information about the lawsuit from Plaintiffs' perspective only, along with a link to the Complaint, was apparently posted on Plaintiffs' counsel's website the day after the discovery conference but has never been disclosed by Plaintiffs to ALDI; rather, ALDI's counsel independently discovered it. *See* Plaintiffs' Counsel's Website Posting, attached as Exhibit R. Like the solicitation letters that were not authorized by this Court (*see* Oct. 2018 Ltr. and Apr. 2018 Ltr., attached as Exhibit S), the unauthorized website posting again paints a one-sided picture. It fails to note that no allegations have been proven in the lawsuit and instead presents all of the following as proven fact:

- "In practice, the Store Managers spent most of their time performing general labor or non-managerial duties rather than management or executive tasks."

- "Consequently, Aldi failed to pay its Store Managers correctly for all hours worked over 40 in a workweek."

- "Aldi typically scheduled its Store Managers to work 50 hours each week, however, in practice, they consistently worked more."

- "Although working overtime was integral to their employment, Aldi's Store Managers consistently failed to receive time and a half (1.5) their regular rate for all hours worked over 40 in a workweek, or any wages for hours over 50 in a workweek."

*See* Ex. R.

In addition, in response to the Court's instructions that Plaintiffs answer Interrogatory No. 4 and Document Request No. 2 completely, Plaintiffs have produced only the October 2018 letters and a list of approximately 200 individuals, which Plaintiffs' counsel limited to recipients

---

to Plaintiff Hunt, which reads, "Identify all persons to whom communications about this lawsuit have been sent by you (which is defined above to include your counsel, and any consultants, experts, investigators, agents, or other persons acting on your behalf). This specifically includes identification of all persons to whom your attorneys sent the communication that is attached as Exhibit 'A.' It also includes communications posted on social media sites including but not limited to Twitter, Facebook, LinkedIn, MySpace, Instagram, Topix, Reddit, and Tumblr."

of the October 2018 (and perhaps the April 2018) mailings instead of including all who had received notice through any means. *See* Apr. 5 to May 23, 2019 E-mail exchanges and attached List of Noticees, with addresses redacted, attached as Exhibit T. Absent from this list are Plaintiffs Jeremy Hunt and David Martin and opt-in plaintiff Dean Welch, and absent from the communications produced are ones about which Plaintiffs Hunt and Gorts testified at deposition.

Hunt testified in his deposition that he heard from Plaintiffs' counsel's firm in late 2017 about its desire to bring a lawsuit and that he did not even understand the basis of it at that time but provided contact information to the firm for other potential plaintiffs. Hunt Dep. 208:10-209:9. Martin heard about the lawsuit from Hunt and then through a call from Plaintiffs' counsel once Hunt had shared Martin's contact information with counsel. Martin Dep. 120:17-121:15.

Because ALDI has moved to compel arbitration of opt-in plaintiff Dean Welch's claims, it has not obtained discovery from him. However, ALDI knows that Welch works for ALDI in Michigan—a state in which none of the named Plaintiffs have resided or worked. Rasmussen Decl. I ¶ 4. How he received notice when he is not receive on Plaintiffs' list of notices via mailings (*see* Exhibit T) is also not explained by Plaintiffs' discovery responses.

Hunt disclosed in his original answer to Interrogatory No. 4 the names of three individuals with whom he had spoken about the lawsuit—Toshiba Smith, Jason Thomas, and David Sheuer. These individuals are not included in but rather are in addition to the list of approximately 200 noticees. *See* Exhibit T. According to Hunt's deposition testimony, he told these individuals that "I spoke with this law firm on these issues of what we could possibly be looking at back pay from." Hunt Dep. 206:16-207:8, 208:1-9.

Hunt's testimony that there were other communications from Plaintiffs' counsel to him and others beyond the April and October 2018 letters produced by Plaintiffs has been confirmed

by Plaintiff Gorts as well. Gorts testified during his deposition that he received a mailer during

his employment with ALDI (*i.e.*, before November of 2017) from the Nicholl law firm

describing a manager job and asking him to contact the firm if the job he did fit that description

because the law firm was gathering information for a class action lawsuit. Gorts Dep. 145:13-

147:8. Moreover, Gorts testified that he did not respond to that mailer. *Id.* Rather, after he left

ALDI, Gorts testified that he received another communication in the form of a cold call from the

Nicholl law firm about his interest in joining the lawsuit. *Id.*

In summary, it appears that Plaintiffs' attempts to notify current and former Store

Managers about this lawsuit have already included *at a minimum* (a) three biased mailings

between November 2017 and October 2018 to an unknown number of individuals beyond the

approximately 200 people whom Plaintiffs have disclosed as noticees, (b) an unknown number

of personal solicitation calls by Plaintiffs' counsel to potential plaintiffs, (c) communications

directly between Plaintiffs and other Store Managers about the amount of back pay they might

recover, and (d) the publication of one-sided information about the lawsuit on counsel's website.

A further court-authorized notice would serve no purpose other than to increase the

prejudice ALDI has already faced in this case. *See Hardesty v. Kroger Co.*, 2016 WL 3906236,

at *2 (S.D. Ohio 2016) ("Courts should be hesitant to authorize duplicative notice because it may

unnecessarily 'stir up litigation' or improperly suggest the Court's endorsement….").

Plaintiffs' unilateral notice through biased mailings, phone calls, and counsel's website

have "poisoned the well" by incorrectly suggesting to Store Managers that the merits of the

FLSA claim have already been determined. Court-approved notice would substantially prejudice

Aldi by implicitly approving and reinforcing Plaintiff's messaging. *See Abner v. Convergys

Corp.*, 2019 WL 1573201, at *7 (S.D. Ohio Apr. 11, 2019) (finding "a follow-up notice is

improper . . . as it may unnecessarily stir up litigation or improperly suggest this Court's endorsement"); *Fetrow-Fix v. Harrah's Entm't, Inc.*, 2011 WL 6938594, at *4 (D. Nev. 2011) (conditional certification is designed "to effectively manage the case by allowing the court," not Plaintiffs, "to control the notice procedure" and to "avoid stirring up litigation through unwarranted solicitation."). As one court aptly explained:

> [P]laintiffs cannot have their cake and eat it too.  That is, they cannot be heard to complain that they want the court to assist in providing notice, while at the same time engaging in conduct that amounts to an organized method to notify potential plaintiffs of a FLSA claim, without any oversight from the Court or defendants.

*Chemi v. Champion Mortg.*, 2006 WL 7353427, at *10 (D.N.J. 2006).

The refusal to certify a collective in these circumstances is not a death knell for Plaintiffs' claims because they already are pursuing and can continue to pursue their claims. Other eligible Store Managers remain free to join this lawsuit without a court issuing notice or certifying a collective, at least in advance of the Court's determination on ultimate (or final) certification at the close of phase two discovery. *See Blake v. Broadway Servs., Inc.*, 2018 WL 4374915, at *2 (D. Md. Sept. 13, 2018) ("Plaintiffs . . . are permitted to 'opt-in' to a § 216(b) action before the action is certified . . . and irrespective of whether a collective action is ever certified."). But because Plaintiffs have already issued notice several times through mail, phone calls, and a public website posting and because Plaintiffs have failed to show that other Store Managers are similarly situated to them, this Court should deny another notice to a putative collective.

## VI.  IF A COLLECTIVE WERE CERTIFIED, THE TEMPORAL SCOPE SHOULD BE NO MORE THAN THREE YEARS FROM A CERTIFICATION ORDER.

While ALDI respectfully submits that no collective should be certified in this lawsuit, if this Court grants Plaintiffs' Motion and authorizes the issuance of notice, the collective should be limited to three years from such an order. This is because any putative opt-in plaintiff who files a consent to join more than three years after the last date of his or her employment as a

Store Manager would be time-barred as a matter of law even under the extraordinary statute of limitations permitted under the FLSA with a showing of willfulness. *See* 29 U.S.C. §§ 255-256. Plaintiffs' request for notice to all Store Managers employed since August 13, 2015 is an implicit request for tolling because it would include otherwise time-barred Store Managers who were last employed by ALDI more than four years before the filing of Plaintiffs' Motion.

Yet Plaintiffs have presented no facts or legal argument for tolling of the statute of limitations and there is no proper basis for it for at least two reasons. First, equitable tolling is available only in exceedingly unusual circumstances and should rarely be invoked. *See Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *Chao v. Va. Dep't of Transp.*, 291 F.3d 276, 283 (4th Cir. 2002); *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 689 n.9 (D. Md. 2010). This is particularly so given the express dictate by Congress that the statute of limitations for FLSA claims should continue to run on each individual's claim until he or she consents to join the lawsuit as a party plaintiff. 29 U.S.C. § 256. Contradicting this congressional mandate is rarely appropriate. *MacGregor v. Farmers Ins. Exch.,* 2011 WL 2731227, at *1 (D.S.C. July 13, 2011); *Noble v. Serco, Inc.*, 2009 WL 3254143, at *2 (E.D. Ky. Oct. 7, 2009).

In *Montelongo v. Housing Authority of City of El Paso*, 2010 WL 3239235 (W.D. Tex. Aug. 13, 2010), the plaintiffs argued that the putative class members would have no idea of their potential claims until notice is provided and that the benefits of an FLSA collective action "depend[ed] entirely on employees receiving accurate and timely notice of their right to participate in a collective action (so that they can make informed decisions on whether to participate)." *Id.* at *8-9 (internal quotation marks omitted). Rejecting plaintiffs' arguments as irrelevant and unpersuasive, the court reasoned that plaintiffs'

> policy arguments do not, by themselves, overcome the oft-affirmed general rule, in FLSA collective actions, that the statute of limitations continues to run for potential opt-in

plaintiffs until said plaintiffs actually opt in. Had Congress wished to have opt-in plaintiffs' lawsuits relate back to the filing date of the lead plaintiff, Congress would have spelled out such a rule instead of spelling out its opposite.

*Id.* at *9 (citations omitted); *see also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152

(1984) ("Procedural requirements established by Congress for gaining access to the federal

courts are not to be disregarded by courts out of a vague sympathy for particular litigants. . . . In

the long run, experience teaches that strict adherence to the procedural requirements specified by

the legislature is the best guarantee of evenhanded administration of the law.").

Second, to invoke the exceedingly rare remedy of equitable tolling, which would be

necessary to justify a collective reaching back more than three years from the issuance of notice,

Plaintiffs would need to prove, separately with respect to *each* particular putative opt-in plaintiff,

(1) that he has diligently pursued his rights and (2) that some extraordinary circumstances

prevented him from taking timely action to preserve his rights. *See Chao v. Virginia Dep't of*

*Transp.*, 291 F.3d 276, 284 (4th Cir. 2002); *see also Boykin v. KeyCorp*, 521 F.3d 202, 211 n.10

(2d Cir. 2008) (tolling as to an entire putative collective "would threaten to extend the doctrine

beyond its limitation to rare and exceptional circumstances") (internal quotation omitted).

Plaintiffs have presented no evidence as to any, much less all, putative opt-in plaintiffs to

support equitable tolling. Plaintiffs have made substantial efforts to usurp the Court's authority in

deciding whether and to whom to issue notice; yet, only a handful of those noticees have

diligently pursued an FLSA claim by opting in. And no extraordinary circumstances have

prevented any putative opt-in plaintiffs from asserting their purported rights.[7]  Accordingly, this

---

[7] The fact that Plaintiffs did not seek court-approved notice until after a period of discovery and that further time will pass while this Court considers the Motion is not a ground for equitable tolling. Indeed, anything over which an FLSA plaintiff has control—like requests for pre-certification discovery—cannot qualify as an extraordinary circumstance that justifies tolling. *See, e.g.*, *Menominee Indian Tribe of Wisconsin v. United States*, __ U.S. __, 136 S. Ct. 750, 756 (2016) (an extraordinary circumstance must be something beyond a litigant's control); *Muhammad v. GBJ, Inc.*, 2011 WL 863785, at *2 (S.D. Tex.

Court should not authorize notice to those who last worked for ALDI more than three years ago.

Doing so would result in clearly time-barred individuals receiving notice of the lawsuit.

## VII.   THIS COURT SHOULD NOT ORDER PRODUCTION OF ALTERNATIVE CONTACT INFORMATION OR PERMIT MULTIPLE MEANS OF NOTICE

Plaintiffs ask this Court to order ALDI to produce all of the following information for each member of the putative collective: "full name, last known residential address, last known work address, last known phone number(s) and last known e-mail address." Doc. 58-9, Proposed Order. If a collective is certified, only names and last known mailing addresses should be produced, and notice should be sent only once by U.S. Mail for the following reasons:

- Many other notices have already been disseminated by Plaintiffs' counsel;

- Privacy interests outweigh Plaintiffs' unsubstantiated request for the production of other contact information, particularly given Plaintiffs' prior conduct of invading the privacy of current and former employees repeatedly by multiple means.[8]

- ALDI does not have email addresses for any of its Store Managers whose employment ended prior to February 18, 2019 and only has it for some Store Managers employed since that date. Moser Decl. ¶ 3.

- Both calling and emailing putative collective members would allow for an exchange that would exceed the scope of any pre-approved notice and that would improperly cross the line from a neutral court-authorized notice to directly aiding further solicitation efforts by Plaintiffs' counsel, which Plaintiffs' counsel has previously demonstrated an intention to do in a biased, one-sided manner.

- Plaintiffs have no right to distract currently-employed Store Managers from their work for which ALDI is paying by contacting them at the workplace.

- Beyond the unfair disruption it would create at ALDI's expense, contacting Store

---

Mar. 9, 2011) (need for pre-certification discovery is not a "rare and exceptional circumstance" that permits equitable tolling); *MacGregor,* 2011 WL 2731227, at *2 (a few months' delay in ruling on conditional certification is far from the extraordinary grounds required for equitable tolling).

[8] *Arevalo v. D.J.'s Underground, Inc.*, 2010 WL 4026112, at *2 (D. Md. Oct. 13, 2010) (refusing to order production of telephone numbers because plaintiffs failed to establish a need for notice by phone that justified the privacy risks inherent in disclosing that information); *Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189, 198 (N.D.N.Y. 2009) (telephone numbers and email addresses, among other private information, should not be produced); *Mohamed v. Sophie's Cuban Cuisine Inc.*, , 2015 WL 5563206, at *6 (S.D.N.Y. Sept. 21, 2015) (same regarding telephone numbers).

Managers through ALDI work addresses and phone numbers would reach only currently-employed Store Managers who could not properly be part of this lawsuit because of the arbitration agreements they have signed.

Further, given Plaintiffs' prior one-sided notification efforts, if this Court were to order notice by any means, ALDI respectfully requests that a third-party provider (at ALDI's expense) be used so that Plaintiffs' counsel do not receive the contact information for *any* putative collective members unless and until they join the lawsuit. Particularly where, as here, the requesting party offers to pay for the administrator, courts have readily granted such requests.[9]

Within all of the above-described parameters for the means and method of notice, if the Court were to order the issuance of notice, ALDI agrees with Plaintiffs' proposal that the parties endeavor to negotiate the contents of that notice and a consent to join form.

## VIII.   CONCLUSION

For all of these reasons, Plaintiffs' Motion for conditional certification and notice to all ALDI Store Managers nationwide should be denied or, at the very least, limited.

DATED:  October 21, 2019                              Respectfully submitted,


                                                      By: s/ Louisa J. Johnson
                                                          One of Counsel for Defendant ALDI Inc.

---

[9] *See, e.g. Drummond v. Herr Foods Inc.*, Civ. 2015 WL 894329, at *5 (E.D. Pa. Mar. 2, 2015) (finding "reasonable" defendant's proposal to pay for a third-party claims administrator to distribute notice); *Nehmelman v. Penn Nat. Gaming, Inc.*, 822 F. Supp. 2d 745, 766-67 (N.D. Ill. 2014) (granting defendant's request to use a third-party administrator to distribute notice, over plaintiff's objection, so long as defendant was willing to pay the associated costs).